J-S59033-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | |
| VINCENT HARRIS | |
| Appellant | No. 1221 EDA 2015 |

Appeal from the Judgment of Sentence March 27, 2015
in the Court of Common Pleas of Philadelphia County Criminal Division
at No(s): CP-51-CR-0006880-2013

BEFORE: BENDER, P.J.E., OLSON, J., and FITZGERALD,[*] J.

MEMORANDUM BY FITZGERALD, J.:          **FILED SEPTEMBER 30, 2016**

Appellant, Vincent Harris, appeals from the judgment of sentence entered in the Philadelphia County Court of Common Pleas following a jury trial and conviction for first-degree murder,[1] criminal conspiracy,[2] violation of the Uniform Firearm Act ("VUFA"),[3] and possession of an instrument of crime ("PIC").[4] Appellant challenges the admission of evidence. We affirm.

We adopt the facts set forth in the trial court's opinion. **See** Trial Ct. Op., 6/30/15, at 2-18. The court sentenced Appellant on March 27, 2015, to a mandatory sentence of life without any possibility of parole on the first-

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. § 2502(a).

[2] 18 Pa.C.S. § 903(c).

[3] 18 Pa.C.S. § 6106.

[4] 18 Pa.C.S. § 907(a).

degree murder charge, five to ten years' imprisonment on the conspiracy charge, one to two years' imprisonment plus probation, on the VUFA charge and six to twelve months' imprisonment plus probation on the PIC charge. All sentences were to run concurrently with one another.

Appellant filed a timely notice of appeal on April 21, 2015. On May 13, 2015, the trial court ordered Appellant to file a Pa.R.A.P. 1925(b) statement. Trial counsel failed to file a Rule 1925(b) statement and instead filed a motion to withdraw from this case with this Court. This Court granted trial counsel's motion to withdraw and directed that new counsel for Appellant be appointed. The trial court appointed Appellant's instant counsel on August 28, 2015. In the interim, the trial court issued a thorough and comprehensive thirty-six page opinion on June 30, 2015.[5]

On appeal, Appellant raises the following issues for review:

I. Did the trial court err in allowing the Commonwealth to read the preliminary hearing testimony of the witness,

---

[5] We note that neither trial counsel nor present counsel filed a Rule 1925(b) statement. It is well settled that the appropriate remedy, pursuant to Pa.R.A.P. 1925(c)(3), is to remand to the trial court for either the filing of a Rule 1925(b) statement *nunc pro tunc* or the filing of a Rule 1925(a) opinion to fully address the issues raised in an untimely Rule 1925(b) statement. Further, this Court has specifically ruled that when a Rule 1925(b) statement is untimely filed, "this Court may decide the appeal on the merits if the trial court had adequate opportunity to prepare an opinion addressing the issues being raised on appeal." **Commonwealth v. Burton**, 973 A.2d 428, 433 (Pa. Super. 2009). In this case, the trial court did have the opportunity to prepare a thirty-six page opinion, which comprehensively addressed the issues Appellant has instantly raised on appeal. Therefore, there is no need to remand this case for the preparation of such opinion and in the interest of judicial economy we proceed to the merits.

Duron Flynn, to the jury because this testimony was hearsay and the Commonwealth failed to show that [A]ppellant had a full and fair opportunity to examine this witness at the preliminary hearing and also failed to show that the witness was unavailable at the time of trial and was [A]ppellant denied his right under the United States Constitution and the Pennsylvania Constitution to . . . [c]onfront this witness?

II. Did the trial court err in allowing the testimony of the Police Officers' Yerges and Buitrago that on 3-21-13 and 3-22-13 over 7 months after the alleged homicide 8-1-12, they observed [A]ppellant searched the residence of [A]ppellant and his grandparents after observing [A]ppellant enter into numerous illicit drug transactions with a confidential informant (CI) and in the residence found the firearm that was used in the homicide and illegal drugs alleged to be crack cocaine and illegal drug paraphernalia when this evidence was not relevant to guilt?

III. Did the trial court err in allowing the testimony of the Police Officers' Yerges and Buitrago that on 3-21-13 and 3-22-13 over 7 months after the alleged homicide 8-1-1[2], they observed [A]ppellant searched the residence of [A]ppellant and his grandparents after observing [A]ppellant enter into numerous illicit drug transactions with a confidential informant (CI) and in the residence found illegal drugs alleged to be crack cocaine and illegal drug paraphernalia when this evidence was not relevant to guilt?

Appellant's Brief at 2.[6]

In his first issue, Appellant argues that the preliminary hearing testimony of witness Duron Flynn was erroneously admitted at trial because this evidence constituted impermissible hearsay. Specifically, Appellant

_____

[6] We note that Appellant presents substantially the same question in his second and third issue.

claims that he did not have a full and fair opportunity to cross-examine the witness at the preliminary hearing and the witness was not truly "unavailable" to testify because the Commonwealth did not pursue an adequate search. In his second issue, Appellant contends that the trial court erred by admitting the testimony of Police Officers Yerges and Buitrago regarding Appellant's illegal drug activities and possession of the murder weapon over eight months after the alleged homicide. We hold Appellant is due no relief.

It is axiomatic that:

> [q]uestions regarding the admission of evidence are left to the sound discretion of the trial court, and we, as an appellate court, will not disturb the trial court's rulings regarding the admissibility of evidence absent an abuse of that discretion. An abuse of discretion is not merely an error of judgment; rather, discretion is abused when "the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias, or ill-will, as shown by the evidence or the record." . . .

***Commonwealth v. Trinidad***, 96 A.3d 1031, 1036 (Pa. Super. 2014) (citations and quotations omitted).

"It is well-established . . . that the introduction of an unavailable witness's prior recorded testimony from a preliminary hearing is admissible at trial and will not offend the right of confrontation, provided the defendant had counsel and a full opportunity to cross-examine that witness at the hearing." ***Commonwealth v. McCrae***, 832 A.2d 1026, 1035 (Pa. 2003). Under the Pennsylvania Rules of Evidence, a witness is deemed unavailable

- 4 -

if attendance at trial cannot be procured through reasonable means. Pa.R.E. 804(a)(5)(A).

Generally, "evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Pa.R.E. 404(b)(1). However, evidence of prior bad acts may be admissible "when offered to prove some other relevant fact, such as motive, opportunity, intent, preparation, plan, knowledge, identity, and absence of mistake or accident." *Commonwealth v. Ross*, 57 A.3d 85, 98 (Pa. Super. 2012). Moreover, "[t]he law presumes that the jury will follow the instructions of the court." *Commonwealth v. Chmiel*, 30 A.3d 1111, 1184 (Pa. 2011) (citations omitted).

After a thorough review of the record, the briefs of the parties, the applicable law, and the well-reasoned opinion of the Honorable Genece Brinkley, we conclude Appellant's issues merit no relief. The trial court's thirty-six page opinion comprehensively discusses and properly disposes of the questions presented. *See* Trial Ct. Op. at 26-36 (finding (1) the preliminary hearing testimony of witness Flynn was properly admitted at trial because Appellant had the opportunity to fully cross-examine Flynn regarding his criminal extract and that the Commonwealth had engaged in a reasonable search for the witness but was unable to locate him, rendering him "unavailable" to testify at trial; (2) the testimony of Police Officers Yerges and Buitrago, regarding Appellant's narcotics activities and

possession of the murder weapon was properly admitted because the evidence was highly relevant to prove Appellant's identity as the shooter in the instant case where the firearm was found in Appellant's residence next to identical narcotics packages as had been in Appellant's possession; and (3) the trial court issued a curative instruction to emphasis that such evidence was not to be considered evidence of a general criminal propensity).  Accordingly, we affirm on the basis of the trial court's opinion.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/30/2016

IN THE COURT OF COMMON PLEAS
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
CRIMINAL TRIAL DIVISION

COMMONWEALTH            :        **CP-51-CR-0006880-2013**

                                  :

CP-51-CR-0006880-2013 Comm. v. HARRIS, VINCENT
Opinion

vs.

7313693021

FILED

VINCENT HARRIS

JUN 3 0 2015

Criminal Appeals Unit
First Judicial District of PA

**SUPERIOR COURT**
**1221 EDA 2015**

BRINKLEY, J.                                   **JUNE 30, 2015**

### 1925(a) OPINION

Defendant Vincent Harris appeared before this Court for a jury trial and was convicted of first-degree murder, criminal conspiracy, violation of the Uniform Firearm Act (VUFA) 6106, and possession of an instrument of crime (PIC). This Court sentenced Defendant to a mandatory sentence of life without any possibility of parole on the first-degree murder charge, 5 to 10 years state incarceration on the conspiracy charge, 1 to 2 years state incarceration plus 5 years probation on the VUFA 6106 charge, and 6 to 12 months state incarceration plus 4 years probation on the PIC charge. The sentences on all charges were to run concurrently with one another. Defendant appealed this judgment of sentence to the Superior Court and, while this Court directed defense counsel to submit a Concise Statement of Errors pursuant to Pa.R.A.P. 1925(b), both defense counsel and Defendant failed to do so. Therefore, this opinion is written pursuant to 1925(a), and the following issues are addressed: (1) whether the evidence was sufficient to find Defendant guilty of all charges; (2) whether the verdict was against the weight

1

of the evidence; (3) whether the trial court properly admitted the prior testimony of an unavailable witness; (4) whether the trial court properly admitted evidence of other bad acts by Defendant.

## PROCEDURAL HISTORY

On March 22, 2013, Defendant was arrested and charged with murder, criminal conspiracy, VUFA 6106 and PIC. From March 24 to March 27, 2015, a trial was held in the presence of a jury. On March 27, 2015, Defendant was found guilty of all charges. On that same day, this Court sentenced him to a mandatory sentence of life without any possibility of parole on the first-degree murder charge, 5 to 10 years state incarceration on the conspiracy charge, 1 to 2 years state incarceration plus 5 years probation on the VUFA 6106 charge, and 6 to 12 months state incarceration plus 4 years probation on the PIC charge. The sentences on all the charges were to run concurrently with one another. On April 21, 2015, Defendant filed a Notice of Appeal to the Superior Court. On May 13, 2015, upon receiving all the notes of testimony, this Court ordered Defendant to file a Concise Statement of Errors Complained of on Appeal pursuant to Pa.R.A.P. 1925(b) by June 3, 2015 but defense counsel and Defendant subsequently failed to do so. On June 17, 2015, defense counsel sent a letter to this Court requesting an extension of time to file the 1925(b) Statement of Errors so that new counsel could be appointed. On June 18, 2015, defense counsel filed a motion to withdraw with the Superior Court.

## FACTS

Trial began in this matter on March 24, 2015. Defendant was represented at trial by Paul DiMaio, Esquire, while the attorney for the Commonwealth was Kirk Handrich, Esquire. The Commonwealth called Officer Carl Charles ("Charles") as its first witness. Charles testified that he had been a police officer for 7 years and had been assigned to the 1st District for 5 years.

2

Charles testified that he was working on the night of August 1, 2012 when, a little before midnight, he received a radio call of a possible shooting and a male down on the highway in the area of 23rd and Mifflin. Charles testified that he drove northbound on 22nd Street until he reached Mifflin, at which point he was flagged down by a crowd that had gathered who informed him that a man had been shot. Charles further testified that he exited his car and saw the decedent, Joseph Knight ("Knight") laying on his right side on the sidewalk in front of 1906 South 23rd Street. Charles testified that he recognized Knight, who was approximately 6'4" tall. (N.T. 3/24/2015 p. 43-48).

Charles testified that Knight appeared to be suffering from multiple gunshot wounds, was breathing lightly and was unresponsive. Charles further testified that he initially called for a rescue unit before he lifted Knight into his patrol car with the help of two or three people at the scene and drove him to the hospital himself. Charles testified that it took him 5 to 10 minutes to transport Knight to the hospital, that he notified the hospital en route that he was arriving with a critical gunshot wound victim and that Knight was unresponsive during the entire car ride. Charles stated that the medical staff was waiting for him when he arrived at the hospital and they immediately took Knight into the trauma unit. Charles testified that he stayed outside to notify the front desk and when he went back three to four minutes later to check on Knight he was informed that Knight had been pronounced dead at 12:15 a.m. Id. at 48-51.

Charles testified that, after Knight was pronounced dead, he called the Homicide Unit to inform them and waited for the detectives to arrive at the hospital. Charles further testified that, when the homicide detectives arrived, they photographed the body and transported Knight to the Medical Examiner's Office. Charles stated that he went to the Homicide Unit later that morning to be interviewed, but had no further involvement in Knight's case after the interview. Charles

3

testified that Knight was wearing black pants and a white t-shirt when he was shot, and that he was bleeding profusely from his lower torso. Charles further testified that he observed gunshot wounds on Knight's arms and left leg. Id. at 59-62.

The Commonwealth called Officer Terrance Lewis ("Lewis") as its next witness. Lewis testified that he had been working for the Crime Scene Unit of the Philadelphia Police Department for 19 years and had been a police officer for 25 years. Lewis testified that he was called to the crime scene at 23rd and Mifflin at 12:20 a.m. on August 2 and arrived at the scene at 1:10 a.m. Lewis further testified that the scene was secured when he arrived, that he took 57 photographs while he was there and that he stayed at the scene until 2:50 a.m. Id. at 73-77.

Lewis testified that he recovered fifteen fired cartridge casings from the scene and all fifteen were from nine millimeter caliber Luger bullets. Lewis stated that the majority of the bullets were manufactured by Speer, but two were from Geco and FC. Lewis further testified that S.E.M. kits were collected from the right and left hands of Jamal Brown ("Brown") and Quontail Silver ("Silver") and submitted to the criminalistics laboratory. Lewis testified that both Brown and Silver tested negative for gunshot residue on either of their hands. Lewis further testified that the fired cartridge casings recovered at the scene were not consistent with being fired from a .38-caliber handgun. Lewis stated that there was black and grayish soot around a hole on the shirt Knight was wearing, which was consistent with the shirt being within 2 to 3 feet of a gun at the time the gun was fired. Lewis testified that he did not examine the fired cartridge casings for latent fingerprints. Id. at 104-21.

The Commonwealth called Albert Chu ("Chu") as its next witness. Chu testified that he had worked as an assistant medical examiner at the Philadelphia Medical Examiner's Office since July 2014. Chu further testified that he had previously worked for nine years as an

4

assistant medical examiner for the Harris County Institute of Forensic Sciences in Houston, Texas and that he went to medical school at the State University of New York in Buffalo, New York before he did a residency training program in anatomic and clinical pathology at the University of Pennsylvania and a one year forensic pathology fellowship training program at the Office of the Chief Medical Examiner for the State of Maryland in Baltimore. Chu stated that he had performed approximately 2500 autopsies and had testified in court about a hundred times in Houston and Philadelphia. Chu was offered and accepted by this Court as an expert in the field of forensic pathology. Id. at 132-36.

Chu testified that he did not perform Knight's autopsy but he reviewed the autopsy report at the request of the District Attorney's Office as the medical examiner who performed the autopsy no longer worked at the Philadelphia Medical Examiner's Office. Chu testified that Knight was a 22-year-old black male who stood 6'6" tall and weighed 190 pounds. Chu further testified that Knight was pronounced dead at the Hospital of the University of Pennsylvania at 12:15 a.m. on August 2, 2012, that the cause of death was multiple gunshot wounds and that he was identified by family members at the Medical Examiner's Office. Id. at 136-38.

Chu testified that Gunshot Wound One entered Knight's body on the left side of his upper chest, passed through his heart and both lungs and was recovered from the right side of his back. Chu further testified that this wound would have resulted in significant internal bleeding, including over a liter of blood in his right chest cavity and over half a liter of blood in his left chest cavity. Chu stated that Knight would have died from this wound within minutes due to the loss of blood and its accumulation around his lungs. Chu testified that Gunshot Wound Two entered on Knight's left buttock and exited on his front left hip. Chu stated that the bullet passed though subcutaneous tissue and was not recovered. Chu further testified that there was soot

5

around the hole in Knight's clothing that corresponded to this wound. Chu testified that Gunshot Wound Three entered on the right side of Knight's back and penetrated only to the soft tissue underneath the skin. Chu stated that, based on the appearance of the wound and the fact that the bullet was recovered in fragments, it was likely that the bullet had struck something before it entered Knight's body. Chu further stated that there was gray soot found around the hole in Knight's clothing that corresponded to this wound. Id. at 139-44.

Chu testified that Gunshot Wound Four entered on the inner aspect of Knight's left forearm, passed through subcutaneous tissue and exited in the middle of his left forearm. Chu testified that Gunshot Wound Five entered on the back of Knight's left wrist, fractured the bone and exited the front of the wrist. Chu testified that Gunshot Wound Six entered on the back of Knight's left thigh and passed through muscle before exiting the front of the thigh. Chu stated that this bullet did not hit any major blood vessels or bones. Chu testified that Gunshot Wound Seven also entered the back of Knight's left thigh close to Gunshot Wound Six, but fractured his femur before it exited the body. Chu testified that Gunshot Wound Eight passed through Knight's left heel. Chu stated that Knight had multiple holes in his clothing which corresponded to the location of his gunshot wounds and that Knight had abrasions above his right eyebrow, nose, below his right eye and on his right shoulder, which would have been consistent with him falling onto the pavement. Chu testified that Knight appeared to be otherwise healthy and testified positive for ethanol and oxycodone. Id. at 144-49.

The Commonwealth called Officer Jason Yerges ("Yerges") as its next witness. Yerges testified that he was assigned to the Narcotics Field Unit and had been a police officer since 2009. Yerges testified that he was working in a plainclothes capacity on March 21 to 22, 2013 as part of an investigation in the 1900 block of South Lambert Street. Yerges testified that, on the

6

22nd, he and other officers executed a search warrant prepared by Officer Carlos Buitrago ("Buitrago") for 1938 South Lambert Street. Yerges testified that Buitrago gave the order to execute the search warrant after a confidential informant ("CI") had purchased narcotics from Defendant using prerecorded bills. Yerges testified that he observed Defendant in the doorway of that address and that he and other officers grabbed Defendant as he tried to go back into the house. Yerges stated that they identified themselves as police, informed Defendant that he was under arrest and handcuffed him after he was positively identified by Buitrago. Id. 153-60.

Yerges testified that there was an elderly male and female inside the property who identified themselves as Defendant's grandparents and the owners of the home. Yerges further testified that, as he searched the home for evidence related to the drug investigation, he climbed onto the kitchen counter and saw a firearm on top of the kitchen cabinet. Yerges testified that the firearm was a nine millimeter Glock 17 handgun and it was loaded with sixteen bullets. Yerges stated that, when he found the gun, it was touching several new and unused narcotics packages. Yerges testified that he subsequently submitted the gun to the Firearms Identification Unit. Yerges stated that Defendant had keys to the house and it appeared that no one other than Defendant and his grandparents lived there at the time. Id. at 160-70.

The Commonwealth called Buitrago as its next witness. Buitrago testified that he had been a police officer since 2001 and had been assigned to the Narcotics Field Unit since 2008. Buitrago testified that, on March 21, 2013, he set up surveillance on 1938 South Lambert Street and observed Defendant enter and exit the property. Buitrago testified that he met with the CI and gave him $20 in prerecorded buy money so that the CI could make narcotics purchases. Buitrago further testified that he observed Defendant exit 1938 South Lambert Street, approach a thin black male in front of the property and exchange items with each other after a conversation.

7

Buitrago testified that the CI provided him with Defendant's telephone number and placed a call to that number in his presence. Buitrago stated that he overheard the CI order two narcotics packages, then the CI exited his vehicle and walked towards 1938 South Lambert Street. Buitrago testified that Defendant engaged the CI in conversation and exchanged small objects for the prerecorded buy money. Buitrago further testified that the CI returned to his location and handed him three orange Ziploc packets which each contained a white chunky substance alleged to be crack cocaine. (N.T. 3/25/2015 p. 7-12).

Buitrago testified that Defendant continued to walk around the neighborhood after the CI had purchased narcotics from him and so he decided to have the CI make another purchase from Defendant. Buitrago stated that he gave the CI another $20 in prerecorded buy money and the CI placed another phone call to the same number as before in his presence. Buitrago testified that he observed Defendant and the CI walk southbound on Lambert Street towards McKean, at which point he instructed his partner to relocate surveillance to McKean. Buitrago further testified that he later observed Defendant walk northbound on Woodstock Street, turn left onto Mifflin Street and turn southbound onto Lambert before re-entering 1938 South Lambert Street. Buitrago testified that the CI returned to him and handed him two orange Ziploc packets similar to the first ones that were purchased, each of which contained a white chunky substance alleged to be crack cocaine. Buitrago stated that, based on his observations, he secured a search warrant for 1938 South Lambert Street. Id. at 12-15.

Buitrago testified that, on March 22, 2013, he and other officers met and set up surveillance for the purpose of executing the search warrant. Buitrago further testified that, around 3:00 p.m., he observed Defendant go inside 1938 South Lambert Street, at which time he and other officers executed the search warrant. Buitrago stated that Defendant was apprehended

8

in his doorway by two officers, who recovered the prerecorded buy money, a cell phone with the same phone number that the CI had dialed previously, and a key for 1938 South Lambert Street from Defendant's person. Buitrago testified that the property was searched, at which time Yerges recovered a nine millimeter Glock Model 17 from on top of the kitchen cabinet alongside numerous new and unused orange Ziploc bags that matched those given to him by the CI. Id. at 16-18.

Buitrago testified that Defendant told the police that he lived at 1938 South Lambert Street with his grandparents. Buitrago stated that he had no involvement in the investigation of Knight's death and that he had no idea at the time that his investigation might have had anything to do with a homicide. Buitrago further stated that he received a call from the Homicide Unit after his investigation was completed and they told him that the gun recovered from 1938 South Lambert Street was used in a homicide. Buitrago testified that he went to the Homicide Unit after the call and gave a brief statement of how his investigation joined with the homicide investigation. Id. at 28-32.

The Commonwealth called Linsday Waltower ("Waltower") as its next witness. Waltower testified that, at around midnight on August 2, 2012, he had been walking home from a bar at 17th and Federal when he stopped at 23rd and Mifflin to talk to some friends. Waltower testified that he knew Knight and that Knight was standing about three or four houses from the corner of 23rd and Mifflin. Waltower further testified that he exchanged greetings with Knight before he went across the street to the McDaniels School to talk to his friends. Waltower stated that he talked to his friends for approximately an hour before they left and that, after they left, he was about to cross the street when he looked up and saw two males riding towards him on bicycles. Waltower further testified that he let the males ride past him and had walked across the

9

street when he heard multiple gunshots and took shelter behind some steps. Id. at 37-45.

Waltower testified that, after the shooting stopped, he looked up and saw Knight lying on the sidewalk about three houses down from where Waltower had taken shelter. Waltower stated that he immediately went to check on Knight, who was breathing in a very labored manner and was bleeding, although he could not see the gunshot wounds on Knight's body. Waltower further stated that Knight was lying face down on the pavement and was unable to communicate with him. Waltower testified that he flagged down a police car that was driving up 23rd Street from McKean and helped lift Knight into the back seat of the car. Waltower stated that it was only a matter of seconds after the bicyclists passed him that the shooting started and that he immediately ducked down behind a set of steps six or seven houses from the corner of 23rd and Mifflin. Waltower further stated that he heard more than ten gunshots in rapid succession and he did not get up from behind the steps until the shooting stopped. Id. at 45-51.

Waltower testified he was picked up by another police officer after he had helped Knight into the police car and was driven around the neighborhood to see if he could identify the shooter. Waltower stated that he was too rattled by what had happened to identify the shooter at that time. Waltower testified that one of the shooters was dark-skinned, while the other was light-skinned and heavy, and identified Defendant as the dark-skinned shooter. Waltower stated that he did not know Defendant from the neighborhood and he could not remember ever seeing Defendant prior to the incident. Waltower testified that he was taken to the police station after he had been driven around the neighborhood and he eventually gave a statement to the police at 6:10 a.m. on August 3, 2012. Waltower further testified that he later gave a second statement to the police in November 2012. Waltower stated that Knight was the only person in the immediate area when the shooters rode past him and that there was more than one gun involved in the

10

shooting, as one set of gunshots sounded louder than the other. Waltower testified that he did not get a good look at the light-skinned shooter but he was able to identify a photograph of Defendant as the dark-skinned shooter. Id. at 52-59.

The Commonwealth called Assistant District Attorney Carlos Vega ("Vega") as its next witness. Vega testified that he worked in the Homicide Unit of the Philadelphia District Attorney's Office and had been a prosecutor for 32 years. Vega testified that he handled the preliminary hearing in the instant case for the Commonwealth and had called Duron Flynn ("Flynn") as a witness at that hearing. Vega further testified that Flynn had given a statement to the Homicide Unit on October 15, 2012 after he had been brought in by the police. Vega testified that the preliminary hearing took place in Courtroom 306 of the Criminal Justice Center on May 28, 2013, at which time Flynn was in custody for another crime and was brought down to attend the hearing. Vega stated that he told Defendant's attorney at the time that he planned to preserve Flynn's testimony and that Flynn was afraid of retaliation as a result of testifying for the Commonwealth at the hearing. Id. at 100-09.

Vega stated that Flynn testified at the preliminary hearing that he was in the area of 23rd and Mifflin when he saw Knight get shot and he identified Defendant as the person who shot Knight. Flynn testified that he saw Defendant jump off his bicycle, pull a gun from his hip and start shooting towards Knight. Flynn further testified that he saw Defendant fire approximately 15 shots at Knight. Flynn testified that Knight tried to run away from Defendant, but fell onto his stomach and Defendant continued to shoot at Knight while he was on the ground. Flynn further testified that Defendant then got onto his bike and rode away. Flynn testified that he had known Knight his entire life and had known Defendant for about eight years. Flynn stated that he did not know why Defendant shot Knight and that he identified a photograph of Defendant as the

11

shooter. Id. at 113-17.

The Commonwealth read a stipulation, by and between counsel, that Flynn was arrested in Lancaster County for retail theft and conspiracy on June 17, 2011 and was sentenced to probation after being convicted later that year. Flynn violated probation in May 2012 and was resentenced to probation. On October 12, 2012, Flynn was arrested in Philadelphia on two counts of burglary and was sentenced to 7 to 23 months incarceration with immediate parole after he pled guilty on May 31, 2013 to attempted criminal trespass on the first charge. The second burglary case was still open as of March 25, 2015 and, on April 16, 2014, a bench warrant was issued by a Common Pleas Court judge on that case. Furthermore, a bench warrant was issued on his first burglary case as well for his Lancaster County case. These warrants were issued between April 2014 to July 2014 and were currently active. Id. at 131-32.

The Commonwealth called Officer Marc Palazzi ("Palazzi") as its next witness. Palazzi testified that he had known Flynn since 2011 and had arrested him in 2012. Palazzi testified that Flynn frequented the area around 1900 South Bonsall Street and 23rd and Mifflin and that he had not seen Flynn in either of those areas since approximately March 2014, despite previously seeing him there almost everyday. Palazzi testified that he was aware that Flynn had numerous active warrants and that the Commonwealth had asked him to bring Flynn in as a witness for the instant case. Palazzi further testified that he found four addresses connected to Flynn and that he came into contact with Flynn's mother at one of the addresses, who told him that she had not spoken to Flynn or seen him in over two years. Palazzi stated that no one he was aware of had been able to locate or arrest Flynn. Id. at 133-37.

The Commonwealth called Officer Matthew Czarnecki ("Czarnecki") as its next witness. Czarnecki testified that he had been an officer in the 17th District for ten years. Czarnecki

12

testified that he was working in a marked patrol car on the night of August 1, 2012, when he received a radio call of a person with a gun in the area of 23rd and Mifflin. Czarnecki further testified that the radio call stated that a male had been shot on the 1900 block of South 23rd Street and the shooter was identified as a black male, wearing a red t-shirt, traveling eastbound on Mifflin Street on a bicycle. Czarneckoi testified that he and his partner began to survey the area and, as they approached the 1700 block of Morris Street, they observed Silver riding a bicycle and wearing a red t-shirt and Brown sitting on the handlebars of the bicycle and wearing a black shirt Id. at 137-43.

Czarnecki testified that he followed the bicycle onto 16th Street, at which time Brown jumped off. Czarnecki further testified that Silver continued to ride the bicycle and tossed what appeared to be a firearm onto the left side of the road on 16th Street. Czarnecki testified that he stopped Silver without incident while his partner called Brown over. Czarnecki testified that his partner recovered a .38-caliber Derringer handgun that was loaded with two bullets from the area where Czarnecki had previously seen Silver throw something onto the road. Czarnecki stated that the Derringer was a very small firearm that was only capable of holding two bullets. Czarnecki testified that Silver and Brown were taken to the Homicide Unit while the gun was placed on a property receipt and given to the Homicide Unit. Czarnecki testified that both Brown and Silver had a S.E.M. kit performed on them and Silver was charged with possession of the Derringer. Czarnecki further testified that he was interviewed by detectives at Homicide but had no further involvement in the investigation of the instant case. Id. at 143-52.

The Commonwealth read a stipulation, by and between counsel, that Detective Holmes from the Homicide Unit went to the Medical Examiner's Office on August 20, 2012 at 9:15 a.m. and received five pieces of ballistic evidence recovered from Knight's body and the body bag.

13

The evidence was taken to the Firearms Identification Unit for a ballistician to examine along with the other ballistic evidence. Id. at 158-59. The Commonwealth moved into evidence a certificate of non-licensure for Defendant, which showed that Defendant did not have a valid license to carry a firearm in Pennsylvania nor a valid sportman's permit to carry a handgun in Pennsylvania on August 2, 2012. Id. at 159-60.

The Commonwealth called Officer Robert Stott ("Stott") as its next witness. Stott testified that he had been assigned to the Firearms Identification Unit for 17 years and had been a police officer for 34 years. Stott testified that he had been trained in the history, design, function and identification of all types of firearms, had visited numerous manufacturers, had been to other laboratories to study their methods and procedures, and had completed numerous courses in distance determination through gunshot residue, serial number restoration, handling and preserving evidence, and tool mark examinations. Stott testified that his training took approximately two years to complete and he had worked on thousands of cases. Stott stated that he had previously testified as an expert in the field of ballistics and firearms identification, and had testified over 300 times in Federal and State court in Philadelphia. Stott was subsequently offered and accepted by this Court as an expert in the field of ballistics and firearms identification and comparison. (N.T. 3/26/2015 p. 5-11).

Stott testified that, in August 2012, his laboratory received ballistic evidence recovered from the crime scene and from the Medical Examiner's Office in the instant case. Stott testified that he received fifteen fired cartridge casings and, of those fifteen, four had hemispherical firing pin impressions while the remaining cartridge casings had oval or Glock-type impressions, which was an impression unique to Glock pistols. Stott testified that the cartridge casings with Glock-type impressions were compared to each other and he determined that they were all fired

14

from the same nine millimeter Glock semiautomatic handgun. Stott further testified that, in March 2013, his laboratory received the Glock model 17 nine millimeter semiautomatic handgun recovered from Defendant's residence to analyze. Stott stated that this model of gun could hold eighteen bullets at a time. Stott testified that the fired cartridge casings recovered from the crime scene and Medical Examiner's office were compared to test-firings from the received firearm and it was determined that the fired cartridge casings with Glock-type impressions were fired from that particular firearm. Id. at 12-22.

Stott testified that, in addition, his laboratory received four bullet specimens, two bullet jackets, and six bullet fragments. Stott further testified that he determined that the bullet specimens were all nine-millimeter Lugers with polygonal-type rifling. Stott stated that five of the six bullet fragments also had polygonal rifling, while the other had conventional rifling. Stott further stated that that bullet fragment was therefore fired from a different type of firearm than the others and therefore at least two firearms were used at the crime scene. Stott testified that he received a bullet recovered from Knight's back from the Medical Examiner's Office. Stott further testified that this bullet was a nine millimeter, expanding type bullet with polygonal type rifling and had gold dye in the hollow cavity of the jacket, which was unique to expanding bullets manufactured by Speer. Stott further stated that there were numerous Speer brand fired cartridge casings found at the scene. Id. at 23-26.

The Commonwealth called Officer Jayson Troccoli ("Troccoli") as its next witness. Troccoli testified that he had worked in the 1st District for 9 years. Troccoli further testified that he knew Ebony Covington ("Covington") as she lived in his patrol area at 23rd and McKean. Troccoli testified that the District Attorney's Office requested him to serve Covington with a subpoena to appear at trial and he made several attempts prior to trial to serve the subpoena.

15

Troccoli further testified that he attempted to get in contact with her family members and was unable to get in contact with anyone from her family or at her residence. Troccoli stated that he had left numerous subpoenas in her mailbox and they would always be taken out of her mailbox when he checked. Troccoli testified that one time he saw the blinds to her residence move, as if someone was peeking out of them, and he waited but no one came out of her house. Troccoli further testified that he knew Defendant from his patrol and that Defendant frequented the area around 21st and McKean. Troccoli testified that he likewise knew Knight from his patrol and Knight frequented the area around 23rd and Mifflin. Id. at 40-47.

The Commonwealth read a stipulation that if Officer Anthony Barbera ("Barbera") was called to testify, he would testify that he worked in the 1st District and was working on the night of August 1, 2012. Barbera would testify that he was at headquarters when he received a call over police radio and proceeded to 23rd and Mifflin in his car. Barbera would further testify that, once he arrived at the crime scene, he saw a group of people pointing eastbound on Mifflin Street and shouting, "They went that way." Barbera would testify that the people at the scene said that the shooters were two black males on bicycles, one of whom was wearing red and the other was dressed in black. Barbera would further testify that he looked for witnesses and was able to locate Waltower and a man named Kenneth Wallace ("Wallace"). Barbera would testify that he took them to view persons who had been stopped by the police and that all the stops were definite negatives, except for two males stopped by Officers Horne and Czarnecki on the 1600 Block of South 16th Street. Barbera would testify that Wallace and Waltower were unsure and could not positively identify the males.

The Commonwealth read a further stipulation that Flynn, in his statement to homicide detectives given on August 15, 2012, stated that he was standing on the corner of 23rd and

16

Mifflin while Knight was sitting on the step on the opposite side of the street from him. Flynn further stated that he saw two males riding bicycles in their direction from McKean Street and he tried to warn Knight, who did not hear him. Flynn identified the males as Defendant and a person named Syeem. Flynn stated that Defendant jumped off his bike, pulled a gun from his waist and started shooting at Knight. Flynn further stated that he heard about 10 or 11 rapid shots as he ran away from the scene. Flynn stated that he returned to the scene after the shooting had stopped and saw that Knight had been injured by the gunshots and had lost a lot of blood. Flynn further stated that the police arrived a few minutes later and took him to the hospital. Flynn stated that he did not see Syeem with a gun. Flynn further stated that Defendant started shooting as soon as he got off his bike and did not say anything to Knight. Flynn stated that Syeem was riding a mountain bike and was wearing a black hooded sweatshirt. Id. at 53-56.

The Commonwealth called Detective Thorsten Lucke ("Lucke") as its next witness. Lucke testified that he had been assigned to the Homicide Unit since 2006 and that he specialized in recovering and analyzing surveillance footage from private businesses and residences. Lucke further testified that he recovered video for the instant case from two businesses in the area of Bonsall and Mifflin. Lucke stated that, after reviewing the footage obtained from these locations, he determined that they did not capture the incident in question. Lucke testified that there was a police department camera mounted on a pole at 23rd and Mifflin, but the camera was not operational at the time of the incident. Lucke testified that he participated in an interview with Waltower on November 29, 2012, that Waltower was shown two arrays of eight photographs each and identified Defendant in the second array. Id. at 59-71. After Lucke's testimony, the Commonwealth rested. Id. at 73.

17

The defense called Dorothy Goldsmith ("Goldsmith") as a witness. Goldsmith testified the she was Defendant's grandmother and that she lived at 1938 South Lambert Street. Goldsmith further testified that she was initially asleep on March 23, 2013 when the police arrested Defendant. Goldsmith testified that her friend, Larry, and Defendant's cousin, Nasir, were also present in the house when the police arrested Defendant. Goldsmith further testified that her daughter and other grandson also had keys to her house and would visit her frequently. Goldsmith stated that sometimes her grandsons would bring friends with them to her house, and often her friends and other relatives would visit her. Id. at 77-82. After Goldsmith's testimony, the defense rested. Id. at 89. The Commonwealth then read a stipulation on rebuttal that Defendant had attended Southern High School in Philadelphia. After the stipulation, the Commonwealth rested on rebuttal. Id. at 90.

## ISSUES

I. WHETHER THE EVIDENCE WAS SUFFICIENT TO FIND DEFENDANT GUILTY OF ALL CHARGES.

II. WHETHER THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE.

III. WHETHER THE TRIAL COURT PROPERLY ADMITTED PRIOR TESTIMONY OF AN UNAVAILABLE WITNESS.

IV. WHETHER THE TRIAL COURT PROPERLY ADMITTED EVIDENCE OF DEFENDANT'S OTHER BAD ACTS.

## DISCUSSION

I. THE EVIDENCE WAS SUFFICIENT TO FIND DEFENDANT GUILTY OF ALL CHARGES.

1. Sufficiency of the evidence.

A review of the sufficiency of the evidence to support a conviction requires that the evidence be reviewed in the light most favorable to the Commonwealth as verdict winner.

18

Commonwealth v. Levy, 2013 PA Super 331, 83 A.3d 457, 461 (2013) (quoting Commonwealth v. Williams, 871 A.2d 254, 259 (Pa.Super. 2005)). The Commonwealth is also entitled to all favorable inferences which may be drawn from the evidence. Commonwealth v. Kelly, 2013 PA Super 276, 78 A.3d 1136, 1139 (2013) (citing Commonwealth v. Hopkins, 67 A.3d 817, 820 (Pa.Super. 2013)). The evidence put forth by the Commonwealth will be considered sufficient if it establishes each material element of the crime beyond a reasonable doubt, even if by wholly circumstantial evidence. Commonwealth v. Franklin, 2013 PA Super 153, 69 A.3d 719, 722 (2013) (citing Commonwealth v. Brewer, 876 A.2d 1029, 1032 (2001)).

When determining whether the evidence is sufficient to support a guilty verdict, the appellate court must examine the entire trial record and consider all of the evidence actually received. Commonwealth v. Graham, 2013 PA Super 306, 81 A.3d 137, 142 (2013) (quoting Commonwealth v. Brown, 23 A.3d 544, 559-60 (Pa.Super 2011)). However, the trier of fact is entitled to believe all, part or none of the evidence received at trial and the appellate court cannot substitute its judgment for that of the fact-finder. Commonwealth v. Fabian, 2013 PA Super 6, 60 A.3d 146, 151 (2013) (quoting Commonwealth v. Jones, 886 A.2d 689, 704 (Pa.Super. 2005)). The facts and circumstances established by the Commonwealth need not eliminate any possibility of the defendant's innocence; rather, any doubt is to be resolved by the fact-finder unless the evidence is so weak and inconclusive that, as a matter of law, no probability of fact could be concluded. Commonwealth v. Stays, 2013 PA Super 170, 70 A.3d 1256, 1266 (2013) (citing Commonwealth v. Aguado, 760 A.2d 1181, 1185 (Pa.Super. 2000)).

### 2. The evidence was sufficient to find Defendant guilty of first-degree murder.

The evidence presented at trial was sufficient to find Defendant guilty of first-degree murder. To obtain a conviction of first degree murder, the Commonwealth must prove that a

19

human being was unlawfully killed, that the defendant perpetrated the killing, and that the defendant acted with malice and a specific intent to kill. Commonwealth v. Diamond, 623 Pa. 475, 83 A.3d 119, 126 (2013) (citing Commonwealth v. Kennedy, 598 Pa. 621, 959 A.2d 916, 920 (2008)). Specific intent to kill as well as malice can be inferred from the use of a deadly weapon upon a vital part of the victim's body. Commonwealth v. Padilla, 622 Pa. 449, 80 A.3d 1238, 1244 (2013) (citing Commonwealth v. Houser, 610 Pa. 264, 18 A.3d 1128, 1133-34 (2011)). The law does not require a lengthy period of premeditation; indeed, the design to kill can be formulated in a fraction of a second. Commonwealth v. Jordan, 619 Pa. 513, 65 A.3d 318, 323 (2013) (citing Commonwealth v. Rivera, 603 Pa. 340, 983 A.2d 1211, 1220 (2009)). Whether the accused had formed the specific intent to kill is a question of fact to be determined by the jury. Id. (citing Commonwealth v. Carroll, 412 Pa. 525, 194 A.2d 911, 916 (1963)).

In the case at bar, the evidence was more than sufficient to find Defendant guilty of first-degree murder. Chu testified that Knight died as a result of eight gunshot wounds to his body, including one which passed through his heart and both lungs. Waltower testified that he saw Defendant ride past him on a bicycle and then heard multiple gunshots almost immediately thereafter. Waltower further testified that, after the shooting ended, he checked on Knight and saw that he was breathing heavily and bleeding. Flynn testified at the preliminary hearing that he witnessed Defendant approach Knight on a bicycle, then pull a gun from his hip and fire approximately fifteen shots at Knight. Flynn further testified that Defendant continued to shoot at Knight even after he had tried to run away and had fallen to the ground. Stott testified that the ballistic evidence found at the scene and recovered from Knight's body was fired from the gun recovered at Defendant's home. Thus, there was ample evidence that Defendant fired a deadly weapon multiple times at vital areas of Knight's body, including his heart and lungs. The jury

20

could therefore infer that Defendant had the specific intent to kill Knight and that he acted with malice when he shot Knight multiple times. Thus, the evidence presented at trial was sufficient to find Defendant guilty of first degree murder.

### 3. The evidence was sufficient to find Defendant guilty of criminal conspiracy.

The evidence presented at trial was sufficient to find Defendant guilty of criminal conspiracy. A conviction for criminal conspiracy is sustained where the Commonwealth establishes that the defendant entered an agreement to commit or aid in an unlawful act with another person or persons with a shared criminal intent and an overt act was done in furtherance of the conspiracy. Lambert, 795 A.2d at 1016 (citing Commonwealth v. Rios, 546 Pa. 271, 684 A.2d 1025, 1030 (1996)). In most cases of conspiracy, it is difficult to prove an explicit or formal agreement; hence, the agreement is generally established via circumstantial evidence, such as by "the relations, conduct, or circumstances of the parties or overt acts on the part of co-conspirators." Commonwealth v. Sanchez, 82 A.3d 943, 973 (Pa. 2013) (quoting Commonwealth v. Johnson, 604 Pa. 167, 985 A.2d 915, 920 (2009)). Four factors are to be utilized in deciding if a conspiracy existed. Those factors are: "(1) an association between alleged conspirators; (2) knowledge of the commission of the crime; (3) presence at the scene of the crime; and (4) in some situations, participation in the object of the conspiracy." Commonwealth v. Nypaver, 2013 PA Super 144, 69 A.3d 708, 715 (2013) (quoting Commonwealth v. Feliciano, 67 A.3d 19, 25 (Pa.Super.2013)). The overt act need not accomplish the crime-it need only be in furtherance thereof. In fact, no crime at all need be accomplished for the conspiracy to be committed. Commonwealth v. Weimer, 602 Pa. 33, 977 A.2d 1103, 1106 (2009).

In the case at bar, the evidence was sufficient to find Defendant guilty of conspiracy. Waltower testified that he saw Defendant and another male ride past him on bicycles before he

21

heard the gunshots. Waltower further testified that there was more than one gun involved in the shooting, as one set of gunshots sounded louder than the other. Stott testified that the ballistic evidence recovered from the scene came from at least two different types of firearms based upon the differences in the rifling on the bullet fragments. The parties stipulated that Barbera would testify that people on the scene told him that the shooters were two black males on bicycles. Flynn, in his statement to police, stated that he had seen Defendant and a person named Syeem approach Defendant while they were on bicycles and then Defendant fired 10 or 11 shots at Knight. Thus, based on their mutual participation in the crime. the jury could infer that Defendant and Syeem had a shared criminal intent to kill Knight and that they took an overt act in furtherance of their intent when they fired multiple gunshots at Knight. Therefore, the evidence was sufficient to find Defendant guilty of conspiracy.

**4.    The evidence was sufficient to find Defendant guilty of violations of the Uniform Firearms Act 6106.**

The evidence was sufficient to find Defendant guilty of carrying a firearm without a license (VUFA 6106). Any person who carries a firearm in any vehicle or any person who carries a firearm concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license commits a felony of the third degree. 18 Pa.C.S.A. § 6106(a)(1). In order to convict a defendant for carrying a firearm without a license. the Commonwealth must prove: "(a) that the weapon was a firearm, (b) that the firearm was unlicensed, and (c) that where the firearm was concealed on or about the person, it was outside his home or place of business." Commonwealth v. Parker, 2004 PA Super 113. 847 A.2d 745. 750 (2004) (quoting Commonwealth v. Bavusa, 750 A.2d 855, 857 (Pa.Super. 2000)). To prove possession of a firearm, the Commonwealth must establish that an individual either had actual physical possession of the weapon or had the power of control over the weapon with the

22

intention to exercise that control. In re R.N., 2008 PA Super 117, 951 A.2d 363, 369-70 (2008) (citing Commonwealth v. Carter, 304 Pa.Super. 142, 450 A.2d 142, 144 (1982)).

In the case at bar, the evidence was sufficient to find Defendant guilty of VUFA 6106. Flynn testified at the preliminary hearing that he was in the area of 23rd and Mifflin when he saw Defendant pull a gun from his hip and shoot Knight. Waltower testified that Knight was standing three or four houses from the corner of 23rd and Mifflin when he saw Defendant ride past him on a bicycle and then heard multiple gunshots. Stott testified that the ballistic evidence recovered from the scene and from Knight's body was fired from the same Glock semiautomatic pistol found at Defendant's house. The Commonwealth moved into evidence a certificate of non-licensure for Defendant, which showed that Defendant did not have a valid license to carry a firearm in Pennsylvania nor a valid sportman's permit to carry a handgun in Pennsylvania on the date of the shooting. Thus, the jury could conclude that Defendant concealed a firearm on his person outside of his home or place of business and that he did not have a valid license to carry a firearm in Pennsylvania. Therefore, the evidence was sufficient to find Defendant guilty of VUFA 6106.

### 5. The evidence was sufficient to find Defendant guilty of possession of an instrument of crime.

The evidence presented at trial was sufficient to find Defendant guilty of possession of an instrument of crime (PIC). A person commits a misdemeanor of the first degree if he possesses any instrument of crime with intent to employ it criminally. 18 Pa.C.S.A. § 907(a). An instrument of crime is defined as "[a]nything specially made or specially adapted for criminal use" or "[a]nything used for criminal purposes and possessed by the actor under circumstances not manifestly appropriate for lawful uses it may have." Commonwealth v. Stokes, 2011 PA Super 261, 38 A.3d 846, 854 (2011). It is undisputed that a gun can be an instrument of crime.

23

Id. Once the factfinder concluded that the defendant was the slayer and that the death resulted from the infliction of a gunshot wound, the factfinder could logically have concluded from all of the evidence that the defendant had possession of a gun, that the gun was an instrument commonly used for criminal purposes, and that his possession of the gun was, under the circumstances, not manifestly appropriate for any lawful use that the gun may have had. Commonwealth v. Buford, 2014 PA Super 224, 101 A.3d 1182, 1190 (2014) (citing Commonwealth v. Woodbury, 329 Pa.Super. 34, 477 A.2d 890, 893-94 (1984)).

In the case at bar, the evidence was sufficient to find Defendant guilty of PIC. Flynn testified at the preliminary hearing that he saw Defendant pull a gun from his hip and shoot Knight multiple times. Waltower testified at trial that he saw Defendant ride past him on a bicycle and heard multiple gunshots a few seconds later. Chu testified that Knight suffered eight distinct gunshot wounds, including one which penetrated his heart and both lungs. Stott testified that the ballistic evidence recovered from the scene and from Knight's body was fired from the same semiautomatic Glock pistol recovered from Defendant's home. Thus, the jury could conclude that Defendant killed Knight and that Knight's death resulted from the infliction of a gunshot wound. Consequently, the jury logically could have concluded that Defendant had possession of a gun, that the gun was an instrument commonly used for criminal purposes, and that his possession of the gun was, under the circumstances, not manifestly appropriate for any lawful use that the gun may have had. Therefore, the evidence was sufficient to find Defendant guilty of PIC.

## II. THE VERDICT WAS NOT AGAINST THE WEIGHT OF THE EVIDENCE.

The verdict in this case was not against the weight of the evidence presented at trial. Under Pennsylvania law, a weight of the evidence claim concedes that the evidence was

24

sufficient to sustain the verdict. Commonwealth v. Lyons, 622 Pa. 91, 79 A.3d 1053, 1067 (2013) (citing Commonwealth v. Widmer, 560 Pa. 308, 744 A.2d 745, 751-52 (2000)). The weight of the evidence is "exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses." Commonwealth v. Luster, 2013 PA Super 204, 71 A.3d 1029, 1049 (2013) (quoting Commonwealth v. Champney, 574 Pa. 435, 832 A.2d 403, 408 (2003)). In addition, "where the trial court has ruled on the weight claim below, an appellate court's role is not to consider the underlying question of whether the verdict is against the weight of the evidence...rather, appellate review is limited to whether the trial court palpably abused its discretion in ruling on the weight claim." Commonwealth v. Collins, 2013 PA Super 158, 70 A.3d 1245, 1251 (2013) (quoting Champney, 832 A.2d at 408). A verdict is not contrary to the weight of the evidence because of a conflict in testimony or because the reviewing court on the same facts might have arrived at a different conclusion than the fact-finder. Commonwealth v. Morales, 91 A.3d 80, 91 (Pa. 2014) (quoting Commonwealth v. Tharp, 574 Pa. 202, 830 A.2d 519, 528 (2003)). Rather, a new trial is warranted only when the jury's verdict is so contrary to the evidence that it shocks one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail. Id.

In the case at bar, the verdict was not against the weight of the evidence presented at trial. Rather, the Commonwealth presented consistent and credible evidence that Defendant shot and killed Knight. Waltower testified at trial that he saw Defendant and another male ride past him on a bicycle immediately before he heard multiple gunshots. Flynn testified at the preliminary hearing that he saw Defendant and Syeem approach Knight on bicycles, take a gun from his hip and shoot Knight multiple times. The parties stipulated that Barbera would testify that witnesses

25

at the scene told him that the shooters were two black males on bicycles. Stott testified that the fired cartridge casings and bullet fragments recovered from the scene and from Knight's body were fired from the Glock semiautomatic handgun found at Defendant's residence. Yerges testified that the handgun was found on top of a kitchen cabinet immediately beside narcotics packages of the same color, size and shape as the packages he witnessed Defendant sell to CI and which were recovered from Defendant when he was arrested. Thus, the Commonwealth presented credible and consistent evidence that Defendant approached Knight on a bicycle then shot him multiple times with his Glock Model 17 handgun. Therefore, the jury's determination that Defendant was guilty of first-degree murder, conspiracy, VUFA 6016, and PIC was not so contrary to the evidence presented at trial so as to shock one's sense of justice. Consequently, the verdict was not against the weight of the evidence presented at trial.

## III. THE COURT PROPERLY ADMITTED PRIOR TESTIMONY OF AN UNAVAILABLE WITNESS.

This Court properly admitted Flynn's testimony from the preliminary hearing in this case. Under both the Pennsylvania and United States Constitutions, a criminal defendant has a right to confront and cross-examine the witnesses against him. Commonwealth v. McCrae, 574 Pa. 594, 832 A.2d 1026, 1035 (2003) (citing Commonwealth v. Bazemore, 531 Pa. 582, 614 A.2d 684, 685 (1992)). It is well-established, however, that the introduction of an unavailable witness's prior recorded testimony from a preliminary hearing is admissible at trial and will not offend the right of confrontation, provided the defendant had counsel and a full opportunity to cross-examine that witness at the hearing. Id. (citing Commonwealth v. Paddy, 569 Pa. 47, 800 A.2d 294, 312-13 (2002)). A declarant is considered to be unavailable as a witness if the declarant is absent from the trial or hearing and the statement's proponent has not been able, by process or other reasonable means, to procure the declarant's attendance. Pa.R.E. 804(a)(5)(A). Although a

26

preliminary hearing is concerned with probable cause and not credibility issues, defense counsel can explore the areas of bias, motive to lie, and lack of credibility on cross-examination. *See* Commonwealth v. Wholaver, 605 Pa. 325, 989 A.2d 883, 902 (2010). Where the defendant has had the opportunity to cross-examine a witness at a preliminary hearing, probing into areas such as bias and testing the veracity of the testimony, cross-examination, and thus confrontation, within the meaning of the Sixth Amendment has been accomplished. Id. at 904.

In the case at bar, the Commonwealth filed a motion to admit prior testimony of an unavailable witness and this Court took testimony on the motion. The Commonwealth called Vega as its first witness on the motion. Vega testified that he handled the preliminary hearing for the instant case on May 28, 2013 and he called Flynn as a witness at the hearing. Vega testified that Flynn was in custody at the time and, after speaking with Flynn, he decided to preserve Flynn's testimony. Vega further testified that he informed Defendant's counsel at the preliminary hearing, Joseph Santaguida, Esquire, that he intended to preserve Flynn's testimony and gave Mr. Santaguida a copy of Flynn's statement to the police and his criminal extract. Vega stated that Flynn seemed concerned about testifying and worried that he would encounter Defendant in prison. (N.T. 3/20/2015 p. 5-10).

Vega testified that Flynn had been brought into custody on October 14, 2012. Vega stated that, based on the fact that Flynn was in custody, his young age, and the content of his statement to the police, he believed that Flynn might become unavailable by the time of trial. Vega testified that at the preliminary hearing he asked Flynn all of the questions that he would have asked him at trial and that Flynn identified Defendant as the shooter. Vega further testified that Mr. Santaguida cross-examined Flynn regarding the incident, his ability to observe and how he came to be in police custody. Vega noted that he only objected to one question asked by Mr.

27

Santaguida, which was speculative, and he did not object otherwise because he wished to preserve Flynn's testimony. Id. at 12-17.

The Commonwealth called Officer Chris Lai ("Lai") as its next witness. Lai testified that he had worked with the South Gang Task Force in the Seventeenth District from June 2002 to February 2015. Lai further testified that he knew Flynn, who frequented the area of 23rd and Mifflin, from the neighborhood and that Flynn was a member of the 2M3 gang. Lai testified that Mr. Handrich asked him to locate Flynn and serve him for upcoming court dates. Lai further testified that the last time he had seen Flynn was at a Focus Deterrence Program meeting at City Hall in March 2014. Lai stated that he was in the area Flynn frequented almost every day that he worked, but he never came in contact with Flynn after March 2014. Lai further stated that he contacted the Probation Department and they had had no contact with Flynn since May 2014. Lai testified that the Probation Department provided him with a few phone numbers for Flynn, which were inactive. Lai further testified that he contacted Flynn's probation officer in Lancaster, Pennsyvlania, and she informed Lai that she had issued a bench warrant for Flynn in July 2014 due to a lack of contact with him. Lai testified that he spoke with Troccoli about Flynn and that Troccoli told him that he had not seen Flynn in over a year. Id. at 21-25.

The Commonwealth called Palazzi as its next witness. Palazzi testified that he had worked in Seventeenth District for approximately 4½ years, had known Flynn since around 2011 and had arrested him for assault in 2012. Palazzi stated that Flynn frequented the areas of 19th and Bonsall Street, and 23rd and Morris, and that he lived at 1610 South Taney Street. Palazzi testified that he had been asked by Mr. Handrich to locate Flynn for the upcoming trial and that he visited multiple addresses associated with Flynn. Palazzi stated that he spoke with Flynn's mother three or four times over a period of three weeks and she told him that she had not seen or

28

heard from Flynn in over two years. Palazzi further testified that the other addresses associated with Flynn were either abandoned or did not exist. Palazzi stated that he spoke with several of Flynn's neighbors, who told him that they had not seen Flynn. Palazzi further stated that he phoned Flynn's mother the night before the instant hearing and that she hung up on him when he asked about Flynn. Id. at 28-32.

The Commonwealth called Officer Andre Pascoe ("Pascoe") as its next witness. Pascoe testified that he had worked for the Philadelphia Probation Department for 4½ years and had briefly supervised Flynn during the summer of 2012. Pascoe testified that the case was a retail theft and conspiracy case from Lancaster County that Philadelphia was doing courtesy supervision for and that he met with Flynn only one time, in August 2012. Pascoe testified that he scheduled another appointment for Flynn in October 2012, but Flynn was arrested on September 30, 2012 and therefore did not come to the appointment. Id. at 38-41.

The Commonwealth called Detective John Brady ("Brady") as its next witness. Brady testified that he worked for the District Attorney's Office and that he was asked by Mr. Handrich to do an abstention check on Flynn. Brady further testified that he checked local, state and federal custody, the Medical Examiner's Office, local hospitals, the Probation Department and Flynn's home address, but was unable to locate him anywhere. Brady testified that he also phoned Flynn's mother and left her several messages, but she never returned his call. Brady stated that he performed these checks on two separate occasions. Id. at 42-44.

The Commonwealth read a stipulation, by and between counsel, that if a witness from the clerk's office was called to testify, they would testify that, on docket CP-51-CR-0003011-2013, Flynn was convicted of attempted criminal trespass and sentenced to 7 to 23 months incarceration. There was subsequently a bench warrant issued for probation violations on that

29

case. On docket CP-51-CR-0003033-2013, Flynn failed to appear on April 16, 2014 in courtroom 1108 and a bench warrant was issued. The Commonwealth then moved a bench warrant issued on Jul 17, 2014 by Judge David L. Ashworth of the Court of Common Pleas of Lancaster County for Flynn into evidence. Id. at 47-49.

The Commonwealth argued that the evidence showed that Defendant had a full and fair opportunity to cross-examine Flynn at the preliminary hearing and that Flynn was unavailable. The Commonwealth stated that Vega had provided Mr. Santaguida with Flynn's statement to the police and his criminal extract and that Mr. Santaguida cross-examined Flynn extensively on Flynn's opportunity to observe, his bias, his knowledge of Defendant, his criminal record, how he got to the Homicide Unit and why he chose to give a statement. The Commonwealth noted that Vega only objected to one question by Mr. Santaguida but otherwise allowed him free reign to cross-examine Flynn. The Commonwealth further argued that the amount of bench warrants Flynn had accumulated and the length of time since he had been in contact with anybody from law enforcement showed that he was unavailable. The Commonwealth noted that Flynn had warrants from Philadelphia and Lancaster County dating from 2014 and that the last time Flynn seemed to have contact with law enforcement was when Lai saw him in March 2014. The Commonwealth argued that they had made a diligent effort to locate Flynn, including going to his addresses on record, checking his phone numbers on record and speaking with his mother, but were unable to locate him. Id. at 51-58.

Defendant argued in response that a preliminary hearing was a limited hearing to find a prima facie case and therefore the cross-examination would be limited based on that fact. Defendant further argued that credibility was not a factor at the preliminary hearing and defense counsel may have abstained from cross-examining on credibility for strategic reasons.

30

Furthermore, Defendant argued that the Commonwealth had failed to prove that Flynn was unavailable. Defendant noted that Lai was unspecific about what he had done since March 2014 to look for Flynn and that he only phoned Lancaster County. Defendant further noted that Palazzi only went to Flynn's house a few times and should have prepared a warrant to go inside the house to find out if Flynn was inside. Consequently, Defendant argued that the Commonwealth had not made a good faith effort to locate Flynn. This Court granted the Commonwealth's motion and stated that the Commonwealth had met its burden of showing that Flynn was unavailable. Id. at 58-62.

This Court properly admitted Flynn's preliminary hearing testimony after finding he was unavailable. As Vega testified, Mr. Santaguida was informed that the Commonwealth intended to preserve Flynn's testimony, was provided with Flynn's statement and criminal extract, and had the opportunity to cross-examine Flynn at the preliminary hearing on the areas of bias, motive to lie, and lack of credibility. Therefore, Defendant had the opportunity to confront the witness against him. Furthermore, the Commonwealth had shown that they had not been able by reasonable means to procure Flynn's attendance at trial. Lai testified that he had not seen Flynn since March 2014 and that the phone numbers associated with Defendant were inactive. Palazzi testified that he had visited addresses associated with Flynn and had spoken to his neighbors and his mother, but was unable to locate him. Brady testified that he was unable to locate Flynn in custody, the medical examiner's office or local hospitals. The Commonwealth also moved evidence that Flynn had multiple bench warrants for failing to appear dating from 2014. Thus, this Court properly allowed Flynn's preliminary hearing testimony to be introduced at trial after finding that Flynn was unavailable.

## IV. THE COURT PROPERLY ADMITTED EVIDENCE OF OTHER BAD ACTS BY DEFENDANT.

31

This Court properly admitted evidence that the murder weapon in this case was recovered during an unrelated narcotics investigation of Defendant. It is well established that the admissibility of evidence is solely within the discretion of the trial court and its decision will not be disturbed on appeal absent an abuse of that discretion. An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law or an exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record. Commonwealth v. Wattley, 2005 PA Super 272, 880 A.2d 682, 685 (2005) (quoting Commonwealth v. Dent, 837 A.2d 571, 577 (PA Super. 2003)).

Where the trial court has stated a "reason for its decision, the scope of review is limited to an examination of the stated reason." Commonwealth v. O'Brien, 2003 PA Super 425, 836 A.2d 966, 968 (2003) (quoting Commonwealth v. Horvath, 2001 PA Super 227, 781 A.2d 1243, 1246 (2001)). "A discretionary rule cannot be overturned simply because a reviewing court disagrees with the trial court's conclusion." Id. (quoting Commonwealth v. Cohen, 529 Pa. 552, 605 A.2d 1212, 1218 (1992)). To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party. Commonwealth v. Lopez, 2012 PA Super 161, 57 A.3d 74, 81 (2012) (citing McNanamon v. Washko, 906 A.2d 1259, 1268-69 (Pa.Super.2006)). An evidentiary error of the trial court will be deemed harmless on appeal where the appellate court is convinced, beyond a reasonable doubt, that the error could not have contributed to the verdict. Commonwealth v. DeJesus, 584 Pa. 29, 880 A.2d 608, 614 (2005) (citing Commonwealth v. Story, 476 Pa. 391, 383 A.2d 155, 164-66 (1979)).

While it is true that evidence of prior crimes and bad acts is generally inadmissible if offered for the sole purpose of demonstrating the defendant's bad character or criminal propensity, the same evidence may be admissible where relevant for another purpose.

Commonwealth v. Powell, 598 Pa. 224, 956 A.2d 406, 419 (2008) (citing Commonwealth v. Kemp, 562 Pa. 154, 753 A.2d 1278, 1284 (2000)). Such relevant purposes include showing the defendant's motive in committing the crime on trial, the absence of mistake or accident, a common scheme or design, or to establish identity. Id. The trial court is not "required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration where those facts are relevant to the issues at hand and form part of the history and natural development of the events and offenses for which the defendant is charged." Commonwealth v. Page, 2009 PA Super 20, 965 A.2d 1212, 1220 (2009) (quoting Commonwealth v. Dillon, 592 Pa. 351, 925 A.3d 131, 141 (2007)). Such evidence may be admitted, however, only if the probative value of the evidence outweighs its potential for unfair prejudice. Commonwealth v. Hairston, 84 A.3d 657, 665 (Pa. 2014). In conducting this balancing test, courts must consider factors such as the strength of the "other crimes" evidence, the similarities between the crimes, the time lapse between crimes, the need for the other crimes evidence, the efficacy of alternative proof of the charged crime, and "the degree to which the evidence probably will rouse the jury to overmastering hostility." Commonwealth v. Brown, 2012 PA Super 150, 52 A.3d 320, 326 (2012) (citing Commonwealth v. Frank, 395 Pa.Super. 412, 577 A.2d 609 (1990)).

In the case at bar, the Commonwealth filed a motion to admit evidence that the murder weapon in the instant case was recovered as a result of an unrelated narcotics investigation of Defendant. The Commonwealth argued that the evidence was essential to prove that Defendant had sole possession of the murder weapon and that it proved Defendant's identity as the shooter in the instant case. The Commonwealth further argued that the evidence was not offered for propensity or character purposes, but was solely offered to prove his possession of the murder weapon. Furthermore, the Commonwealth argued that Pennsylvania law allowed such evidence

33

when it was offered to prove identity and possession of the murder weapon and that any prejudice could be cured by an appropriate instruction to the jury. (N.T. 3/20/2015 p. 67-71).

Defendant argued in response that the evidence was highly prejudicial because the weapon was recovered seven months after the murder in question and would require Defendant to testify to explain the evidence. Defendant further argued that the evidence would only show possession of the weapon and would not prove his identity as the shooter. Defendant argued that it was sufficient to allow the jury to hear that the gun was recovered in Defendant's grandmother's house during a separate incident and omit any reference to the drugs. Id. at 72-74.

This Court granted the Commonwealth's motion and allowed evidence of the narcotics investigation to prove Defendant's identity as the shooter. This Court noted that in Commonwealth v. Reed, the Pennsylvania Supreme Court allowed evidence of an unrelated murder that occurred six days after the murder in that case as the ballistic evidence recovered at the scene of the second murder tended to prove Defendant's identity as the shooter in the first case. *See* Commonwealth v. Reed, 533 PA 508, 626 A.2d 118 (1993). In allowing the evidence, the Supreme Court stated that objections to such evidence went to the weight of the evidence rather than to its admissibility. Id. This Court noted that the gun was found beside unused narcotics packets of the same size, shape, and color as the packets that were given to the CI and discarded by Defendant during his arrest. Therefore, this Court stated that the narcotics evidence supported the Commonwealth's argument that the gun was constructively possessed by Defendant and proved Defendant's identity as the shooter. Id. at 74-77.

This Court properly allowed evidence that the murder weapon was found during an unrelated narcotics investigation of Defendant. The evidence was highly relevant to prove Defendant's identity as the shooter in the instant case, as it showed that Defendant was in

34

constructive possession of the murder weapon, and was not offered for propensity purposes. The firearm was found hidden on top of a kitchen cabinet in Defendant's residence immediately next to unused narcotics packages of the same size, shape and color as those sold to the CI and discarded by Defendant during his arrest. Therefore, the narcotics evidence was essential to show that Defendant had constructive possession of the firearm and thereby prove his identity as the shooter in the instant case. Furthermore, any prejudice that resulted from the evidence was cured by an appropriate instruction to the jury. After Yerges testified, this Court gave the following instruction to the jury,

> "Ladies and gentlemen, yesterday you heard testimony from Officer Yerges, and this also applies to the testimony that you're going to hear from Officer Buitrago, tending to prove the defendant allegedly possessed drugs and/or sold narcotics on March 21st and March 22nd. 2013, for which he is not currently on trial...This evidence is before you for a limited purpose. That is for the purpose of tending to show the defendant in possession or constructive possession of the Glock 17, nine millimeter handgun found on top of the kitchen cabinet inside of 1938 South Lambert Street on March 22, 2013. This evidence must not be considered by you in any way other than for the purpose I just stated. You must not regard this evidence as showing that the defendant is a person of bad character or criminal tendencies from which you might infer guilt."

(N.T. 3/25/2015 p. 6-7). Thus, this Court properly allowed the narcotics evidence as it was highly relevant to prove Defendant's identity as the shooter in the instant case and any prejudice that resulted therefrom was cured by the instruction to the jury.

35

## CONCLUSION

After a review of the applicable rules of evidence, statutes, case law and testimony, this Court committed no error. The evidence was sufficient to find Defendant guilty of all charges. The verdict was not against the weight of the evidence. This Court properly admitted the prior testimony of an unavailable witness. This Court properly admitted evidence of other bad acts by Defendant. Therefore, this Court's judgment of sentence should be upheld on appeal.

BY THE COURT:

_____ J.

36